IN RE INTEREST OF DYLAN W., A CHILD
UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE,
V. PATRICIA W., INTERVENOR-APPELLANT.
606 N.W.2d 847

Filed February 22, 2000. No. A-99-023.

Laura L. Hilliard and, on brief, Jeffrey A. Wagner, of Legal Aid Society, Inc., for intervenor-appellant.

Christopher E. Kelly for appellee.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

SIEVERS, Judge.

This action began in 1994 when Dylan W., a minor, was removed from the care of his mother, Raquel W., by the State for reasons irrelevant to this appeal. Raquel was murdered in 1995. On August 20, 1998, Patricia W., Dylan's maternal grandmother, intervened in the Douglas County Separate Juvenile Court seeking custody of Dylan or, in the alternative, visitation with him. The court denied custody and visitation on December 7, from which order Patricia appeals.

## BACKGROUND

On July 19, 1994, prior to Raquel's death, the State filed a petition alleging Dylan came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993) by reason of the faults or habits of Raquel. The allegations contained in the State's petition were found to be true when Raquel admitted such on January 30, 1995. Raquel was murdered on June 14, 1995. Dylan was then ordered to remain in the custody of the Department of Social Services, now the Department of Health and Human Services (DHHS), for adoption planning and placement.

Patricia filed a motion to intervene on April 16, 1998, and requested custody of Dylan. On August 20, Patricia filed a motion for custody or, in the alternative, visitation. A hearing was held on December 1 to determine Patricia's motion for custody and visitation.

Patricia stated that she is the primary care provider for Dylan's sister, Breana W., who is approximately 18 months older than Dylan. Patricia is now Breana's legal guardian. She stated that during the time Dylan was in foster care, she attempted to maintain contact with Dylan. While Dylan was in the first foster home, Patricia had daily contact with him. Dylan was then placed with Adele Wise. Patricia had limited contact with Dylan while he was in the Wise home. At the time of trial, Dylan had been residing with Wise for 2 years. Wise's daughter, Stacy Wise, tutors Dylan in reading and intends to adopt him.

While there was no expert medical testimony adduced at trial concerning Dylan's needs, the record indicates that Dylan suffers from fetal alcohol effects and attention hyperactivity disor-

der, requiring close supervised care in a therapeutic environment. Wise is a licensed therapeutic foster parent, and Stacy Wise is a licensed therapeutic foster parent as well. Dylan was moved to Stacy Wise's home on the day of the hearing for preadoptive placement. Dylan receives a high degree of structure in Wise's home, which is expected to continue in Stacy Wise's home. The therapeutic foster care coordinator, Colleen Roth, stated that visitation between Dylan and Patricia would not be beneficial because Patricia lacks the consistency and commitment which Dylan needs. Roth further stated that Dylan needs the structured therapeutic setting he would get residing with Stacy Wise.

In December 1995, Patricia requested that she be considered as an adoptive parent for Dylan. Sherry VanMoorleghem, a DHHS adoption specialist, went to Patricia's home to conduct an adoption assessment. Based on this assessment, an adoption team determined that placing Dylan with Patricia would not be in Dylan's best interests. According to VanMoorleghem, the decision was based on several factors. First, although Patricia denies it, VanMoorleghem stated that Patricia's own daughters had been wards of the State. She also stated that Dylan was disturbed by Raquel's death and talked about it at school, yet Patricia denied ever talking to Dylan about Raquel's death. VanMoorleghem testified that Patricia had been having unauthorized overnight visits with Dylan; however, Patricia denied she had such visits when VanMoorleghem questioned her about such visits. Finally, VanMoorleghem stated that during the assessment, Patricia seemed more concerned with what benefits and how much money she would receive if Dylan were placed with her. Based on these factors, the adoption team determined that it was not in Dylan's best interests to be placed with Patricia.

Patricia appeals the order dated December 7, 1998, denying her motion for custody or, in the alternative, visitation.

## ASSIGNMENTS OF ERROR

Patricia brings two assignments of error: (1) The court erred in denying her motion for custody and (2) the court erred in denying her motion for visitation.

## STANDARD OF REVIEW

■ Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings; however, where the evidence is in conflict, the appellate court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997); *In re Interest of Anthony G.*, 6 Neb. App. 812, 578 N.W.2d 71 (1998).

■ Determinations concerning grandparent visitation rights are initially entrusted to the discretion of the trial judge, whose determination, on appeal, shall be reviewed de novo on the record and affirmed in the absence of an abuse of the trial judge's discretion. *Beal v. Endsley*, 3 Neb. App. 589, 529 N.W.2d 125 (1995); *Dice v. Dice*, 1 Neb. App. 241, 493 N.W.2d 207 (1992).

## ANALYSIS

*Custody.*

■ Patricia first argues that the lower court erred in denying her motion for custody. The Nebraska Supreme Court has said the "first and primary consideration in any case involving the custody of a child is the best interest of the child." *State v. Loomis*, 195 Neb. 552, 557, 239 N.W.2d 266, 269 (1976). Neb. Rev. Stat. § 43-295 (Reissue 1998) generally empowers the juvenile court to "order a change in the custody or care of any such juvenile if at any time it is made to appear to the court that it would be for the best interests of the juvenile to make such change." See *In re Interest of Joshua M. et al.*, 4 Neb. App. 659, 548 N.W.2d 348 (1996). To prevail on appeal, Patricia must show that the juvenile court abused its discretion by denying her motion for custody and that such denial was not in Dylan's best interests.

■ The record shows that Patricia was considered as an adoptive parent and underwent a preadoption assessment. VanMoorleghem stated that she conducted the assessment and that the adoption team determined that placing Dylan in Patricia's home would not be in Dylan's best interests. There is nothing in the record to dispute VanMoorleghem's testimony.

While Patricia does present evidence showing that she has endured considerable challenges in her own personal life, such as serious injuries from an automobile accident, she presents no evidence to prove that placing Dylan with her would serve Dylan's best interests. Furthermore, the record shows that Dylan was relocated to Stacy Wise's home as part of a preadoption placement plan. In order for a court to disapprove of a DHHS plan recommending a course of action with respect to a child in its custody, a party must prove by a preponderance of the evidence that the plan is not in the child's best interests. Neb. Rev. Stat. § 43-285 (Reissue 1998); *In re Interest of Tabatha R.*, 255 Neb. 818, 587 N.W.2d 109 (1998). Patricia has made no showing that the DHHS adoption plan for Dylan is not in his best interests. The record supports the court's denial of Patricia's custody motion, and we find Patricia's first assignment of error is without merit.

*Visitation.*

Patricia next argues that the court erred in denying her motion for visitation. Although an appellate court ordinarily considers only those errors assigned and discussed in the briefs, the appellate court may, at its option, notice plain error. *Dike v. Dike*, 245 Neb. 231, 512 N.W.2d 363 (1994). Plain error is "error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process." *Id.* at 233, 512 N.W.2d at 365. When lack of jurisdiction in the original tribunal is apparent on the face of the record, yet the parties fail to raise that issue, it is the duty of a reviewing court to raise and determine the issue of jurisdiction sua sponte. *In re Interest of D.W.*, 249 Neb. 133, 542 N.W.2d 407 (1996); *In re Interest of D.M.B.*, 240 Neb. 349, 481 N.W.2d 905 (1992).

We have previously stated that "[i]t is axiomatic that the issue of parental visitation rights is included within the Nebraska Juvenile Code and is subject to judicial determination." *In re Interest of Laura O. & Joshua O.*, 6 Neb. App. 554, 557, 574 N.W.2d 776, 779 (1998). Grandparent visitation is a creature of statute. See Neb. Rev. Stat. § 43-1802(2) (Reissue 1998); *Pier v. Bolles*, 257 Neb. 120, 596 N.W.2d 1 (1999). A

court may grant reasonable rights of visitation to grandparents when the court determines by clear and convincing evidence (1) that there is, or has been, a significant beneficial relationship between the grandparent and the child; (2) that such visitation is in the best interests of the child; and (3) that such visitation will not adversely interfere with the parent-child relationship. § 43-1802(2); *Pier v. Bolles, supra*; *In re Interest of Kayle C. & Kylee C.*, 253 Neb. 685, 574 N.W.2d 473 (1998).

However, a court must have jurisdiction to determine grandparent visitation. The domestic relations matters statute, Neb. Rev. Stat. § 25-2740 (Cum. Supp. 1998), provides:

> (1) For purposes of this section:
>
> (a) Domestic relations matters means proceedings under . . . sections 43-1801 to 43-1803 (including grandparent visitation); and
>
> . . . .
>
> (2) . . . in domestic relations matters, a party shall file his or her petition and all other court filings with the clerk of the district court.

This statute became effective July 15, 1998, before Patricia filed her motion for custody or visitation. The matter was heard on October 30 and December 1, 1998, resulting in Patricia's custody and visitation motion being denied by the separate juvenile court's order of December 7. While the above suggests that the separate juvenile court denied Patricia's visitation motion without proper statutory jurisdictional authority because such is lodged in the district court, we do not agree.

We have previously stated that a juvenile court would not be the proper venue for a grandparent to petition for grandparent visitation under the grandparent visitation statutes. See *In re Interest of Zachary W. & Alyssa W.*, 3 Neb. App. 274, 526 N.W.2d 233 (1994). However, Patricia has not asserted her claim under the grandparent visitation statutes. Patricia's claim for visitation does not cite any specific statutory authority as a basis of the court's power to grant or deny such relief, i.e., jurisdiction. Nonetheless, we conclude that it is within the juvenile court's statutory jurisdiction to determine a motion for visitation asserted by a grandparent who has properly intervened. See *In re Interest of Ditter*, 212 Neb. 855, 326 N.W.2d 675 (1982).

 Pursuant to Neb. Rev. Stat. § 43-284 (Reissue 1998), a juvenile court may permit a juvenile adjudicated under § 43-247(3) to remain in his or her own home subject to supervision or *may* make an order committing the juvenile to the *care* of some reputable citizen or *suitable family*, or to the care and custody of DHHS. *In re Interest of Crystal T. et al.*, 7 Neb. App. 921, 586 N.W.2d 479 (1998). The liberal use of the word "may" in this statute authorizes the juvenile court "to exercise broad discretion in its disposition of children." *In re Interest of Amber G. et al.*, 250 Neb. 973, 981-82, 554 N.W.2d 142, 148 (1996). The Supreme Court has held that under this statute, the juvenile court would have discretionary authority to award temporary custody to the grandparents of a juvenile upon a finding that they qualify as "reputable citizen[s] of good moral character" or "suitable family." § 43-284. See *In re Interest of Kayle C. & Kylee C., supra.* We conclude that providing for visitation, including with a grandparent, is within the juvenile court's broad powers to provide for the "care" of an adjudicated minor.

 We next consider what standard of proof Patricia must meet in order to determine on our de novo review whether the juvenile court erred in denying her motion. In *In re Interest of Zachary W. & Alyssa W., supra,* we stated that any right the grandparents might have to visitation while their grandchildren are in the custody of DHHS is subject to a showing that such visitation is in the best interests of the children. The Legislature used that standard when it recognized limited grandparents' visitation rights in § 43-1802. Section 43-1802 provides a logical, practical, and proper standard by which to judge a grandparent's request to a juvenile court for visitation, or the request of a "reputable citizen." The statute states, in pertinent part, with respect to grandparent visitation:

> (2) . . . Reasonable rights of visitation may be granted when the court determines by clear and convincing evidence that there is, or has been, a significant beneficial relationship between the grandparent and the child, that it is in the best interests of the child that such relationship continue, and that such visitation will not adversely interfere with the parent-child relationship.

With this standard in mind, we review the evidence adduced at trial concerning Patricia's motion for visitation.

Patricia's first witness, a district judge, stated that he saw Patricia interact with Breana in the context of various 12-step program events, but he could not recall observing Patricia with Dylan. Patricia's next witness, Tammy Sturdivant, Breana's schoolteacher, stated that she had not had an opportunity to observe Patricia with Dylan. Patricia next called 8-year-old Breana, who stated that she loved Dylan and wanted him to come live with her; however, she offered nothing of substance concerning Dylan's relationship with Patricia. Patricia next called her former attorney. He testified concerning his representation of Patricia's own children, but he was not even aware that Patricia had grandchildren. Patricia then called Mary Galligan Cornett. Cornett had been Patricia's supervisor during a 20-year period when Patricia worked in the Omaha city clerk's office. Cornett stated that she had not seen Dylan since he was less than a year old, but that she had observed Patricia with Breana. However, the trial court determined that Patricia's relationship with Breana was irrelevant to the issue of her relationship with Dylan and consequently excluded such evidence. Patricia does not assign error to that ruling.

Patricia next called Lola Jones, a personal friend. Jones stated that she had observed Patricia with Dylan and that in her opinion, they had a loving relationship. On cross-examination, Jones estimated that she observed Patricia with Dylan approximately four times, the first time being when Dylan was a baby. The last time she saw Dylan and Patricia together was at Breana's fifth birthday party, which would have been at least 3 years prior to the day Jones testified.

Patricia then called her daughter-in-law, who testified about her own relationship with Dylan and Dylan's relationship with his great-grandmother, who is now deceased. The daughter-in-law did not testify concerning Dylan's relationship with Patricia. Finally, Patricia testified on her own behalf. Patricia stated that after Raquel was murdered, she was devastated. She also stated that the death of her mother was very hard on her. She did not start visitations with Dylan until he was 3 years old. At that time, Dylan was in foster care in his first foster home. During

this time, Patricia stated that she visited Dylan daily and that Breana stayed at the first foster home for the last 5 or 6 months that Patricia's mother was alive. Patricia produced photographs of a birthday party she gave Dylan in October 1995, which photographs were received into evidence as exhibit 16. Patricia stated that after Dylan was moved to Wise's home, Breana had spent the night with Dylan there. Patricia could not recall how often she visited with Dylan after he moved to Wise's home.

The State first called Roth, Dylan's foster care coordinator, who stated that Patricia's visitations with Dylan had been "very sporadic." Roth stated that the time between visits could be as long as 6 months. She stated that Patricia had seen Dylan during Christmas 1997 but that she did not visit again until July 4, 1998. Roth opined that visitation between Patricia and Dylan would not be beneficial to Dylan because Patricia's visitations lacked consistency and Dylan requires a lot of structure and close supervision.

The State then called Wise, who had provided foster care for Dylan for 2 years beginning in late November 1996. She stated that Patricia had come to her home while she had him. The first time was in October 1997 when Patricia came to visit for Dylan's birthday. Wise thought Patricia would be taking Dylan with her for the day, but, instead, Patricia left Breana at Wise's home so that Breana could spend the day with Dylan. Wise stated that Patricia dropped Breana off at around 10 or 11 a.m. and that she only spoke with Dylan briefly before leaving. Wise took Breana home later that evening around 6 or 7 p.m. Wise stated that on the second occasion when Patricia came to visit Dylan, Patricia visited with Dylan for "a few minutes" and then had coffee and visited with Wise for about 1½ hours. Wise stated that Patricia would call once every few months. During these calls, Patricia would ask about Dylan and confront Wise with issues of Dylan's care and Wise's compensation that she received for caring for Dylan. On cross-examination, Wise stated that Dylan had affection for both Patricia and Breana, and she agreed that there was a deep emotional bond between Dylan and Breana.

The next witness to testify concerning the relationship between Patricia and Dylan was Janice George, a protection and

safety worker with DHHS. She stated that Patricia's visits with Dylan were sporadic and that she was aware of only two visits since October 28, 1997, when she became Dylan's case manager. Those visits occurred on Dylan's birthday in October 1997 and on July 4, 1998. The State's final witness was VanMoorleghem, whose testimony we have earlier detailed.

Patricia's argument is focused on the court's denial of visitation as being unfair to her, rather than being against Dylan's best interests. Patricia has not shown by clear and convincing evidence that she and Dylan have a significant beneficial relationship which is in Dylan's best interests.

Dylan is a special needs child who is being adopted into a home which can fulfill his needs. Patricia's desires are subordinate to Dylan's needs. We find no abuse of discretion when the juvenile court denied Patricia's motion for custody and visitation.

AFFIRMED.